There is one matter on the motion's calendar, National Football League Management Council versus the National Football League Players Association. We'll hear counsel, starting with the Players Association. Good afternoon. Thank you. May it please the court. We are here seeking an injunction pending appeal. Ezekiel Elliott faces irreparable harm. He is an all-pro professional football player in the middle of an NFL season. The NFL conceded irreparable injury below, and this court and many other courts have found irreparable injury in similar circumstances. Without an injunction pending appeal, Mr. Elliott will serve his entire suspension before this court can even consider the merits of our appeal. That shouldn't happen because we have raised substantial legal questions as to whether Mr. Elliott received a fair process. Three different federal judges have reached that conclusion. They recognized that the arbitrator deprived Mr. Elliott of mounting a defense to a very serious charge. He was unable to cross-examine the central and decisive witness, and key conclusions of the NFL's lead investigator were kept from the commissioner and from the commissioner's independent advisors, at a minimum. Am I correct that it's common ground that under the contract, the arbitrator's review is for arbitrary and capricious ruling by the commissioner? That is correct, Your Honor. What does that standard mean in this context where the player challenging the ruling has a right to sponsor testimony and present documents? Precisely, Your Honor. So in this court's decision in Brady, it may— In Brady, there was a lot of evidence introduced to the arbitrator. Exactly right. And what the court emphasized there was at the point of the Article 46 hearing was, quote, to make a complete factual record. And our contention here is that Mr. Elliott was not able to do that. He was not able to complete the factual record by cross-examining the central and decisive witness. But she had been interviewed six times, two times in person, four times over the phone. The commissioner was aware of Roberts, Friel's, and Lanier's view of her credibility problems. What would it have added to have her testify before the arbitrator? There's pages and pages of her statements and inconsistencies in those statements. What would it have added, really? Your Honor, the NFL, the lead investigator, as you point out, interviewed her six separate times. The lead investigator who did those interviews, Kia Roberts, concluded she wasn't credible. There was insufficient evidence to go forward with a charge. The commissioner ultimately in the initial discipline said that three of the five events would be the subject of discipline. So even he didn't find them to be all credible. My question is what would it have added to that? If we had had the opportunity to cross-examine Ms. Thompson, we would have been able to establish a lack of credibility and evidence for the remaining three incidents on which the commissioner had found her credible. Roberts is a former prosecutor herself. She was questioning these credibility issues constantly and following up. How were you deprived of anything that would have resulted in anything helpful before the arbitrator? Well, Your Honor, it's very much the difference between an investigator who is asking questions and someone who is representing a player, in this case, whose life, career, and reputation are on the line. We are going to be asking different questions. We are going to be looking for every angle to find exculpatory evidence. Correct me if I'm misunderstanding this, but the purpose of the hearing is not to find the facts. It's to make a determination whether the commissioner acted in an arbitrary and capricious way in the process that led him to make a decision to impose discipline. And here, the complete record, and you had access to that record, of the evidence that the commissioner relied upon, medical evidence, the text messages, the forensic evidence, the testimonial evidence, was before you and before the arbitrator. So what would additional testimony have added to the evaluation of whether the commissioner acted in an arbitrary and capricious way? Additional evidence would have enabled us to prove that the three events did not occur. That's what the commissioner imposes discipline. The player is given the right under the CBA to challenge the discipline. The CBA itself, Article 46.2, authorizes the player to present any relevant evidence into the hearing by testimony or otherwise. It doesn't include a right to confront witnesses providing evidence on which the hearing officer may rely, and it doesn't refer to compulsory process. In the paragraph that refers to representations, there's a contractual right to be accompanied by counsel, and there's a right to present any relevant evidence. So you're reading additional procedural rights into that provision, aren't you? Or help me if I'm misunderstanding. No, no. And respectfully, Your Honor, I do think there's a misunderstanding there. First, on the heading. The heading is irrelevant. Article 70 of the CBA expressly provides that headings are not to be construed or considered in interpreting the contract. So I would throw out that. I would throw out the piece on discovery I think is another heading, and I would just take the language at its terms. Secondly, even the arbitrator in this case, if you look at the decision on the motion to compel, believed he had the authority and the discretion to compel. And that's not surprising. We have cited many cases, including the decision by former Southern District Judge Barbara Jones, who compelled the testimony of Commissioner Goodell. When she found that that was necessary for the player to be able to establish his case, we cited Commissioner Paul Tagliabue's decision as an arbitrator to compel the testimony of not only third parties, but true third parties to the National Football League. At the time, one of the principal witnesses, the main accuser, was a coach at Princeton University. The commissioner directed him to come. So the legal framework— Witnesses can be brought before the hearing. Yes, I understand that. Yes. Yes, precisely. But the arbitrator said, you know, even if I had the right to compel her, I would not bring her in. It's not essential to Mr. Elliott's defense. That's right. It's not different, though. Okay. So stepping back, I think this gets to the fundamental disconnect in how the NFL and the NFLPA look at the law that governs here. That is a procedural ruling or an evidentiary decision. The NFL's position is that those should never, or at least rarely ever, be subject to judicial review. Our position is that is fundamentally incorrect under the Supreme Court's decision in MISCO, under the LMRA, and we know for a century under the FAA that arbitral awards, evidentiary decisions that exclude material and pertinent evidence, can be reviewed by courts. And the fundamental fairness term is to make sure, at least in the FAA context, that the evidence is not just material and pertinent, but it's sufficiently important that it affects the fundamental fairness of the proceedings. And so where I think the NFL gets off the path in terms of the law of arbitration is they are looking solely at cases and language that focus on, you bargain for the arbitrator's construction of the contract, the good, the bad, the ugly, just as Kagan's opinion for the court in Oxford Health. That is the analog in the FAA of 10A4, which says you vacate an award where the arbitrators exceed their powers. But that is not the full field of the bases for vacating arbitral awards. 10A3, just for example, is the material and pertinent evidence standard. 10A1 and 10A2 get to evident partiality and corruption and fraud. And the NFL, I think, further kind of- Let me ask you this. Sure. What was the arbitrator's power to compel the appearance of Ms. Thompson? Well, the arbitrator has the authority, certainly, to request that a witness who has cooperated with the league, given six interviews, produced text messages and all electronic evidence, and there is a provision in Article 2 of the collective bargaining agreement. It's a best efforts provision. And what Article 2 says, with respect to all of the remaining articles in the CBA, including Article 46, the NFL must exercise best efforts to comply with the conditions and the obligations of the remainder of the agreement. So at a minimum, they have to use best efforts to help the players vindicate the rights that are granted under the CBA. That is the arbitrator's power. Now- She's no more related to the NFL than she is to the Players Association. I don't- Your Honor, again, I do not- There is- And she's not under the control of anybody except Ms. Thompson. You and I might look at this agreement and say there is no authority to- explicit authority to compel third parties. That is not what the arbitrator said here, okay? So we are- if we have a bargain for the arbitrator's authoritative construction of a contract- Or did the arbitrator say, I'm not going to exercise my power to compel her appearance? He made the latter determination, what I would call a relevancy determination, an evidentiary or procedural determination, which the league says you can't review, you shouldn't review, or if you do, it has to be, quote, affirmative misconduct by the arbitrator when the reality is whether you look at it under, as a matter of federal common law, under MISCO, drawing on the FAA, or as an application of Article 46 rights, it is a procedural ruling that deprived Mr. Elliott of the right to a fundamentally fair hearing. The phrase that's used in some of the cases, the arbitrator must be guilty of misconduct or must have engaged in affirmative misconduct, that does not require mens rea or bad faith. Justice- then Judge Cardozo, just a few years after the Federal Arbitration Act was enacted, gave the authoritative interpretation of the guilty of misconduct and clearly says it does not require bad faith. That's why the mens rea grounds for vacating arbitral wards are set forth in other provisions of the FAA. What is sinister about the commissioner meeting with one investigator and not the other one when the investigator that he met with seems at least entitled to be the boss of the one he did not meet with? I think, Your Honor, if you're looking at what would be a- the commissioner can meet with whoever he wants. As I understand the argument that has been presented by the NFL to date, it is that the commissioner loved his staff, wanted his staff to compile kind of a nice, holistic totality, review the evidence, and the commissioner would kind of dig in there and decide, you know, what happened, what didn't happen. The problem is that he received a distorted and incomplete picture of the facts. You're quite right that- I think that the district judge found that what he received was a reasonably complete statement of the facts, including those facts upon which Ms. Roberts formed her doubts. I respectfully don't agree with that, Your Honor. I respectfully don't agree with that. Let me ask you this directly. Didn't Friel tell the commissioner that Roberts didn't believe her? Ms. Friel testified at one point that she did. The NFL below in the transcript absolutely conceded she did not. Well, the question- There's a direct- there's a direct- I'm sorry, Your Honor. Well, you told the commissioner Ms. Roberts thought there was not sufficient corroborating evidence to go forward with the matter. Answer, yes. What's equivocal about that or unclear about it? Well, it is impossible to reconcile with the NFL's statement below that the commissioner knew of credibility concerns but did not know her ultimate view that there was insufficient corroborating evidence. Another question. The commissioner was told at the meeting that Kea Roberts did not think we had enough for a violation. Who came up? It came up from me and from Kathy Lanier, who was her boss. That was the purpose of Kathy being at the meeting. Right. Was that unclear? Your Honor, respectfully, I think as you've seen in the passages we cite, those are the later passages. Go to the provisions in the transcript where she's first asked. She says, I don't know if the views were presented to the commissioner. I have no idea. They may have been communicated. I don't know. I thought she said that they may have been privileged and then she withdrew that argument. No, Your Honor, and I'd be happy on rebuttal to cite you to the specific inconsistencies in her transcript. It's also, a point is, these aren't facts that need to be found here. If anything, our ultimate relief would be a MISCO remand for a procedurally fair hearing for the arbitrator to make these kinds of findings. The arbitrator did not find what the commissioner knew or didn't know. The arbitrator didn't make a finding on whether the independent advisors received just Ms. Friel's view and, in fact, not Ms. Roberts' view. When Chairwoman Mary Jo White asked Lisa Friel at the independent advisors meeting, she asked the money threshold critical question. You've investigated her, you've investigated and interviewed her several times. Did you find the witness credible? And Ms. Friel, who had never met Ms. Thompson in her life, said, well, no, not for the December 22nd incident, but for the rest, on balance. She never communicated that Ms. Roberts, who'd spent all that time and reviewed all the evidence and done every interview, she never communicated to Ms. White that those were Roberts' views. So then the commissioner subsequently has independent discussions with each of those advisors, none of whom was informed about Keough Roberts' views. And again, just stepping back, we're here seeking very temporary relief. Irreparable harm is clear under the case law. We need to show serious questions that are fair ground of litigation that would permit us to bring our appeal to the court on the basis of full briefing and argument. That's quite modest relief, and I'd like to reserve the remainder of my time. I'm afraid there is no time, but if the panel wants to hear rebuttal, we will ask for it. Thank you. Thank you, Your Honor. We'll hear the Management Council. Thank you, Your Honors, and may it please the Court. A critical starting point in considering any motion for injunction pending appeal is the standard of review that governs the underlying claim. If plaintiffs bring a rational basis challenge to a federal statute, their effort to enjoin the statute pending appeal of a decision denying a preliminary injunction would almost certainly fail because the standard of review facing the underlying claim would make it exceptionally unlikely that they would ever prevail in the case. The same logic applies here. As this Court made clear in the Brady case, the standard that faces someone bringing a collateral attack to a labor arbitrator's decision is one of the most daunting standards known to the law. And I'm happy to talk about the fundamental fairness question and whether that's even something that arises under the LMRA, but I'm happy for purposes of the injunction pending appeal to— Why don't we assume that? Yeah, I think that is frankly the safer way to do it. That's what a merits panel may decide. Exactly. So let's assume arguendo it applies. I don't think we have anything here that really even approaches a finding of fundamental unfairness. And I think I would start with the observation that even if we're in fundamental fairness or unfairness land, we're still going to have to talk about the collective bargaining agreement because there's nothing fundamentally unfair about holding parties to the terms of a collective bargaining agreement. That's a very lofty level of generality. It is, but that's where I start, at the lofty level of generality. Then I bring it down to this particular collective bargaining agreement and the fact that it has to be common ground between the parties, that there's no compulsory process rights in this particular agreement. And so what we have is we have a history under this agreement that when you have witnesses that are essentially under the control of the NFL, and I think it's fair to say arbitrators over the years have used sort of a loose standard of that. So it's true in the Bounty Gate case there was one individual who had been an assistant coach in the NFL. I understand at the time he was looking for another job in the NFL, and so the NFL was told you can produce that particular witness. We don't have anything like that here. As Judge Jacobs pointed out, Ms. Thompson is essentially a stranger to both the league and to the NFLPA. She's not actually a stranger to Mr. Elliott, but in any event, you know, and there was no obstruction if somehow they could get her to testify. There was no obstruction to that, and I think that's all that 46.2b talks about. When it talks about the ability of either the NFL or the NFLPA to present relevant evidence, I think what it's talking about there is evidence that you have. I don't think the agreement itself really directly deals with this issue of compelling witnesses. When we consider whether there are sufficiently serious questions going to the merits, why shouldn't we consider Judge Mazant's opinion? I know it was found that he lacked jurisdiction, but after all, he would have decided this case if the Players Association had beaten your client to the courthouse door and had brought this matter to the Texas District Court. Well, a couple of things, Your Honor. Firstly, I do think that the right treatment of a decision rendered by a court without jurisdiction is to ignore it. But on the assumption that you want to take a look at what he decided, what I would tell you is I would say that Judge Mazant's opinion is an object lesson in the dangers of untethered fundamental fairness review, because obviously if Judge Mazant was the arbitrator, he could have made different judgments on these various calls. But I think when we're at the level where my friend on the other side is going to, wants to come back and rebuttal and tell you about different ways you could try to reconcile Ms. Friel's testimony, I mean, when we're at that level, I think you're at the level where there is no likelihood of success whatsoever in bringing a successful challenge, collateral challenge. The standard is under the personal conduct policy is does the commissioner have credible evidence, right? So you had the three chief investigators, at least Roberts and Friel, and Roberts' boss, Lanier, all told the commissioner that the witness was not believable. At least that's what it says in the arbitration transcript. How is that credible evidence that he had? Well, Your Honor, I think that you have to be careful about that, because, I mean, let's start with Friel, for example. Friel did not say that there was a credibility problem with the witness that infected the testimony as to all five incidents. What she said is that there was not credible evidence, in her view, with respect to the July 22nd incident. Then she said generally that Kia had credibility issues, that I agreed with her on the credibility issues that she had. Sure, and the credibility issues. She was just at one day. Well, I think what she's referring to there are the credibility concerns that Kia Roberts identified in the addendum to the report. I think it was Exhibit 99. And she had a variety of concerns. I think virtually all of them went to the two incidents that the commissioner did not find ultimately credible evidence to support. And just to get into the weeds a little bit of this, and I gather if you've read the report, you're already aware of this, but there were distinct credibility concerns with the incident on the 22nd. That was the incident where there were witnesses that had conflicting views. That was the situation where there was a suggestion that she told her friend to fabricate some evidence. So there's no question everybody who looked at this had problems with the 18th and the 22nd. And even with respect to whatever effect you might have of thinking that Ms. Thompson had credibility concerns, as a result of those incidents, that might cause you to take her other statements with a grain of salt, that's why the commissioner was so careful in his conclusions to say that none of my conclusions are based on the testimony of a single witness, and they are based on corroborating evidence, and particularly the photographic evidence. So when she has a suggestion that she was beaten on a particular date, and then three hours later there's a photograph that's sent to one of her relatives that shows bruises from the beating, I mean, that's something where whatever credibility concerns you might have with the witness in the abstract, when the external information is corroborating her side of the story, I think that certainly satisfies the credible evidence standard. And I'm not here to tell you that somebody else couldn't look at this and reach a different judgment about whether there was credible evidence. But the one thing this collective bargaining agreement is most clear about is that the party who's supposed to impose discipline for conduct detrimental to the league is the commissioner. That was a direct subject of bargaining, and the parties wanted the commissioner to do it. I can assure you that it's not something that he views as the most attractive part of his job, because whatever you decide, if you are too tough on the player, you end up in court with a case like this. If you are not tough enough, you end up being criticized for being light on domestic abuse and similar problems. Let me ask you this. I mean, there was a 14-month investigation here, and it seems odd for you to be arguing that this is such a frantic emergency that it can't wait another couple of months after all. What if, in order to get it right, the investigation had lasted another four months? Well, we would be here in January. How would the NFL have been injured? How would it have been harmed? Well, Your Honor, I don't think anybody, I don't think you, I don't think the other side, wants the NFL to finish its investigatory report before it's done. Yes, and if it had taken another four months, then you would have found that to be worthwhile, and the NFL would have suffered no detriment, I think, unless you can explain something. If the report had come out in the off-season, there would not have been an immediate detriment to the league. But the CBA is very specific, not just about this discipline, about all of the discipline. I mean, if you look at this from a broader lens, over just the last season and a half, the league has imposed discipline on 100 players over 500 games total. The collective bargaining agreement is quite specific that the discipline imposed is supposed to take effect on the first game after the internal arbitral appeals are exhausted. And it's very important, I think, for the league to make sure that that actually happens because there are competitive balance concerns. But didn't your client agree to delay the suspension for one game? And doesn't that undercut the argument about the need to go forward with all due dispatch at this point? No, it doesn't, Your Honor, and we tried to be as clear about that in our opposition brief as we could be, but let me try to be even clearer. At the point that the agreement to not have the suspension take effect in Week 1 was made, there was no final arbitral decision. And the arbitration agreement is specific that the suspension doesn't take place until that is issued. Maybe I'm misremembering the record, but didn't the arbitrator's decision issue before that Sunday, before the Sunday of the week? Yes, it ultimately did. I think it was, like, on a Friday. So it didn't go into effect that first game. It didn't, but the judgment was, because at the point that the league is making this judgment, it's something like Tuesday or Wednesday before the first week of the season, at that point they can't have the suspension take effect that week. They can't have the suspension take effect immediately because the arbitration is ongoing. So at that point, on something like a Tuesday or Wednesday, they make a decision that we don't know when the decision is coming out. It could come out after the first week. It could come out before it. And we're going to say that if it comes out before, it's not going to take effect because we think that's most fair to both teams because there's an unfairness to the other team, not the Cowboys, to have to do its roster planning and the like before that first game. That's a completely different, I think, situation than the idea that this is going to not take effect, essentially, until next season. And I do think that's the kind of thing where, you know, the league made a reasonable judgment. I don't think it betrays a lack of irreparable injury. I think it tends to demonstrate the adage that no good deed goes unpunished, since trying to be reasonable in week one has now led to the suggestion that the league has no weighty interest on the other side, which I just don't think is the case at all. I think there are substantial issues here about competitive balance for the league. This is not, I mean, you know, this is not just about Mr. Elliott and the Cowboys, but there are competitive interests with all 32 teams. The effect of all these legal proceedings, and I'm not complaining about any one of them, I'm just saying the effect of all of this is that this suspension that was supposed to take place through weeks two to seven, if it's going to take place this year at all, is going to take place at a different time of the season. This creates the prospect that a player, I'm not suggesting it's happened here, I'm just saying it creates the prospect that you could game the system. I also think there's an important competitive interest because if during this time period where the suspension, in our view, should have been served but hasn't been served, Mr. Elliott had suffered an injury, then it would be very easy for him to drop the appeals at that point and take the suspension at a time period for games that he couldn't play otherwise. Would you agree, though, that the harm is greater to Mr. Elliott now than it would have been eight games ago? You've got the playoffs coming up. You've got the end of the season. I mean, wouldn't you concede that it certainly came up a bit in the Brady appeal where at least he served the four games at the beginning of the season. All the games were important. I understand that. But isn't it a greater hardship to him now, eight games into the season? I don't think it really is, Your Honor. I think in order to really answer that question, I'd need to know, and I do know, but I'm just saying in the abstract I'd need to know what's the Cowboys' record now, what is their schedule coming up look like. I mean, if this is actually coming up on sort of the easy part of the schedule where the Cowboys maybe think they can make do with the other running backs they have, this could be the ideal time for them to serve the suspension. The one thing I would say about Brady — Do you think the Cowboys might say this is the ideal time to serve the suspension? Well, obviously they think it's never, and I think if they were 8-0, they would have a different view of that question than if they were more like 500. So, I mean, it's never going to be the time that they want the suspension served because they don't want it served. I would say that as to the Brady case, there is, and this is part of the league's operating procedures, when you have discipline that takes effect during the offseason, it is supposed to be served at the beginning of the season, not seven or eight weeks in. And, again, just to take a step back, I mean, that's something that's supposed to happen for all of these players. I mean, unfortunately, discipline is a fact of life in the NFL. As I said, there's 100 incidents of discipline. I haven't double-checked this, but I would assume that virtually all, all 32 teams have had at least one suspended player. They all have an interest in having the same basic rules apply to them. The other thing I would say, and perhaps end on this so I do not abuse my time, is simply to say that whatever one thinks about the balance of irreparable injury and the league's interest, that still has to be considered in conjunction with the likelihood of success on this appeal. And I think particularly when Judge Fela has thoroughly and thoughtfully considered all of the same factors and found them wanting here, when you put it in conjunction with the incredible demanding standard for somebody bringing a collateral challenge to a labor arbitration agreement, when you put it in the context of it still being an open circuit, whether the fundamental fairness theory that they have put all their eggs in even exists, when you put all that together, this just doesn't satisfy the standards for an injunction pending appeal. Thank you very much. Unless there are questions, we will reserve decision. Thank you both. Please adjourn court.